## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MEDSTAR HEALTH, INC.** : | |
| **5565 Sterrett Place** : | |
| **Columbia, MD 21044** : | |
| : | |
| **MEDSTAR-GEORGETOWN** : | |
| **MEDICAL CENTER, INC.** : | |
| **3800 Reservoir Road, N.W.** : | |
| **Washington, D.C. 20007** : | |
| : | |
| **WASHINGTON HOSPITAL CENTER** : | |
| **CORPORATION** : | **Civil Action No. 06-** |
| **110 Irving Street, N.W.** : | |
| **Washington, D.C. 20010** : | |
| : | |
| **and** : | |
| : | |
| **NATIONAL REHABILITATION** : | **JURY TRIAL DEMANDED** |
| **HOSPITAL, INC.** : | |
| **102 Irving Street, N.W.** : | |
| **Washington, D.C. 20010** : | |
| : | |
| **on behalf of themselves and all others** : | |
| **similarly situated in the United States** : | |
| **or alternatively on behalf of themselves** : | |
| **and all others similarly situated in the** : | |
| **District of Columbia,** : | |
| : | |
| **Plaintiffs,** : | |
| : | |
| **v.** : | |
| : | |
| **BECTON DICKINSON & COMPANY** : | |
| **1 Becton Drive** : | |
| **Franklin Lakes, New Jersey 07417** : | |
| : | |
| **Defendant.** : | |

## CLASS ACTION COMPLAINT

MedStar Health, Inc., MedStar-Georgetown Medical Center, Inc., Washington Hospital

Center Corporation and National Rehabilitation Hospital, Inc. (collectively, "MedStar" or

"Plaintiffs") bring this class action on behalf of themselves and all others similarly situated, and aver, upon best information and belief, as follows:

## NATURE OF THE ACTION

1.      MedStar is one of many hospitals and healthcare providers, which, at all relevant times, bought disposable hypodermic products manufactured by Defendant Becton Dickinson ("Becton"). Plaintiffs bring this civil action for nationwide equitable relief and damages for violating federal antitrust laws and the District of Columbia's antitrust law and common law.

2.      The disposable hypodermic products at issue include relevant product markets for: (a) disposable syringes and associated needles; (b) disposable blood collection tubes; (c) disposable blood collection tube holders; and (d) intravenous ("IV") catheter devices and their associated needles. Collectively, the products in these markets are referred to herein as "Disposable Hypodermic Products."

3.      MedStar and other healthcare providers face the daily problem of providing high-quality healthcare at an affordable price. Becton, a large healthcare-product manufacturer, for decades has been the dominant manufacturer of syringes and other Disposable Hypodermic Products in the United States. Becton has been able to maintain its monopoly and/or market power in the markets for Disposable Hypodermic Products by unreasonably restraining trade and otherwise foreclosing competition through anticompetitive and illegal actions. As a result of this conduct, Becton has been able to overcharge hospitals and other healthcare providers for its Disposable Hypodermic Products. MedStar and other healthcare providers, dedicated to providing superior medical care, have been left to pay the bill for Becton's abuse of its dominant position.

4.      Upon information and belief, Becton's anticompetitive practices were structured to eliminate competition for Disposable Hypodermic Products. Furthermore, Becton: (1)

2

imposed market share purchase requirements on healthcare providers; (2) bundled its goods for exclusionary and predatory purposes; (3) contracted with GPOs to impose exclusionary conditions on Class members; and (4) bundled its goods with other manufacturer's goods for exclusionary purposes.

5.    Absent Becton's anticompetitive conduct, Plaintiffs and other healthcare providers would have paid less for the Disposable Hypodermic Products purchased during the Class Period (defined below). Prices for these products would have been lower with unfettered competition because: (a) Becton would have been forced to compete with products that were either superior in quality and/or less expensive, thus forcing Becton to lower prices or risk losing significant sales and market share; (b) healthcare providers would have replaced some Disposable Hypodermic Products purchased from Becton with less-expensive Disposable Hypodermic Products sold by Becton's competitors; and (c) Becton's competitors would have been able to achieve economies of scale with sufficient market entry that would have put further downward pressure on Becton's prices for Disposable Hypodermic Products.

6.    Since at least the late 1980s, Becton has used (and continues to use) anticompetitive and illegal practices to achieve and maintain its dominant market position and market power, unreasonably restrain trade, and otherwise foreclose competition in the relevant markets by suppressing and foreclosing competition from existing competitors like Terumo Medical Corporation ("Terumo") and product innovators such as Retractable Technologies, Inc. ("RTI"). This conduct has enabled Becton to charge prices for Disposable Hypodermic Products substantially above competitive levels.

7.    Until July 2, 2004, when Becton settled an antitrust lawsuit brought by RTI for $100 million, Plaintiffs and other healthcare providers did not have sufficient reason to

3

investigate Becton's pricing and marketing practices for Disposable Hypodermic Products. Moreover, a very broad protective order existed in that litigation and healthcare providers, including Plaintiffs, did not, and could not, gain access to documents related to Becton's business planning, competitive responses, and pricing strategies. Accordingly, Becton's conduct has tolled the statute of limitations from at least 1988 through at least July 2, 2004 for the claims stated herein as well as others that have yet to be discovered.

## JURISDICTION AND VENUE

8.    Plaintiffs bring this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, to recover treble damages, equitable relief, costs of suit and reasonable attorneys' fees for Becton's violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, as well as Section 3 of the Clayton Act, 15 U.S.C. § 14. Subject matter jurisdiction is proper pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a), and 28 U.S.C. §§ 1331 and 1337, because the action arises under the laws of the United States.

9.    This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(a), as the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

10.    This Court also has jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), providing for jurisdiction where, as here, "any member of a class of plaintiffs is a citizen of a State different from any defendant" and the aggregated amount in controversy exceeds five million dollars ($5,000,000), exclusive of interests and costs. *See* 28 U.S.C. §§ 1332(d)(2) and (6).

11.    Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) and (c) because during the Class Period Becton resided, transacted business, was found, or had agents in this district, and because a substantial part of

events giving rise to Plaintiffs' claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this district.

12.    The Court has personal jurisdiction over Becton pursuant to 28 U.S.C. § 1391 as well as pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22.

### THE PARTIES

13.    MedStar Health, Inc. ("MedStar") is a non-profit healthcare corporation organized under the laws of Maryland with its principal place of business at 5565 Sterrett Place, Columbia, MD 21044.  MedStar operates a community-based network of hospitals and other healthcare providers, including surgery centers, physician's practices, and nursing homes, in the Washington-Baltimore region.  MedStar owns three subsidiaries which operate hospitals located in Washington, D.C.: MedStar-Georgetown Medical Center, Inc. (which operates Georgetown University Hospital); Washington Hospital Center Corporation (which operates Washington Hospital Center); and National Rehabilitation Hospital Inc. (which operates National Rehabilitation Hospital).  At all relevant times, MedStar purchased Disposable Hypodermic Products manufactured by Becton for use in its hospitals, physician's practices, surgery centers, nursing homes, and other health care settings.

14.    MedStar-Georgetown Medical Center, Inc. is a corporation organized under the laws of the District of Columbia with its principal place of business at 3800 Reservoir Road, N.W., Washington, D.C. 20007.  Washington Hospital Center Corporation and National Rehabilitation Hospital Inc. are corporations organized under the laws of Delaware and their principal places of business are, respectively, 110 Irving Street, N.W., Washington, D.C. 20010 and 102 Irving Street, N.W. Washington, D.C. 20010.

15.    Becton Dickinson & Company is a corporation formed and existing under the laws of the State of New Jersey, with its principal place of business at 1 Becton Drive, Franklin

5

Lakes, New Jersey 07417. Becton is a manufacturer of Hypodermic Products that regularly

transacts business in this judicial district.

## CLASS ALLEGATIONS

16.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil

Procedure 23(a), (b)(2) and (b)(3), on their own behalf and as representatives of the following

class of persons and entities ("the Class"):

> All hospitals and healthcare providers in the United States who purchased
> Disposable Hypodermic Products manufactured by Becton through Becton's
> authorized distributors, at any time during the period 1988 through the present
> (the "Class Period"). The Class excludes Becton, Becton's parents, subsidiaries
> and affiliates, as well as all Becton's authorized distributors.

17.    *Alternatively*, or in addition, Plaintiffs bring this action as a class action pursuant

to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3), on their own behalf and as

representatives of the following class of persons ("the Indirect Class"):[1]

> All hospitals and healthcare providers in the District of Columbia who purchased
> Disposable Hypodermic Products manufactured by Becton through a distributor
> or wholesaler at any time during the period 1988 through the present (the "Class
> Period"). The Class excludes Becton, Becton's parents, subsidiaries and affiliates,
> and all distributors or wholesalers.

18.    Joinder of all Class members is impracticable. While the size of the Class is not

yet known with certainty, based on the nature of the trade and commerce involved, Plaintiffs

reasonably believe that the Class numbers in the thousands. Class members are geographically

dispersed throughout the United States. The Class members are readily identifiable from

information and records in Becton's possession and in the possession of Becton's authorized

distributors and wholesalers.

19.    Questions of law and fact are common to the Class, including but not limited to:

a.    whether Becton's anticompetitive conduct is continuing, thus entitling the Class to injunctive relief to promote unrestrained trade and free and fair competition.

b.    whether Becton engaged in agreements, contracts, combinations, and conspiracies, which had the purpose and/or effect of unreasonably restraining competition thereby artificially inflating prices and limiting purchaser access to Disposable Hypodermic Products;

c.    whether Becton obtained and maintained monopoly and/or market power in the markets for the Disposable Hypodermic Products in the United States;

d.    whether Becton's anticompetitive contracts, combinations, and conspiracies have caused Plaintiffs and the other members of the Class to suffer antitrust injury in the nature of overcharges;

e.    whether Becton's contracts with GPOs, separately, and as part of its market-wide scheme to monopolize, have resulted in unreasonable restraints on trade and competition; and

f.    whether Becton's unlawful conduct caused Plaintiffs and other Class members to pay more for the Disposable Hypodermic Products than they otherwise would have paid without such conduct ever occurring.

20.    Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and other Class members purchased Disposable Hypodermic Products manufactured by Becton and were overcharged as a result of Becton's market-wide and centrally-controlled scheme and thus were injured by the same wrongful conduct.  Defendant's antitrust violations, those violations' effects, and the relief sought, are all issues or questions common to Plaintiffs and Class members.

21.    As Class representatives, Plaintiffs will fairly and adequately protect the Class Members' interests and have engaged counsel experienced and competent in antitrust and class litigation.

---

[1] The allegations in this Complaint generally apply to both classes.  Allegations that only apply to one class are explicitly stated as such.

22.    The questions of law and fact that are common to the members of the Class predominate over any questions affecting only individual Class members. Whatever possible issues may exist in managing the class action are greatly outweighed by the corresponding advantages. Those advantages include, but are not limited to, providing Class members with a method for redress of claims that might otherwise not warrant individual litigation.

23.    Class action treatment is a superior method for fairly and efficiently adjudicating this controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessarily duplicating evidence, effort, and expense that numerous individual actions would engender. A class action enables injured persons or entities to obtain redress on claims that might not be practicable to pursue individually. Class treatment also eliminates the potential for inconsistent adjudications.

## RELEVANT MARKETS AND MARKET POWER

24.    Defendant's conduct was specifically intended to eliminate or lessen competition and unlawfully acquire and maintain monopoly and/or market power in the markets for Disposable Hypodermic Products, including Disposable Syringes and their associated needles; Blood Collection Tubes; Blood Collection Tube Holders; and IV Catheters and their associated needles. Such products at issue in this case are classified by the FDA as Non-Exempt Class II devices and are sold within the relevant markets described below. The FDA approval process is a significant barrier to entry that makes it more difficult for manufacturers to successfully enter the markets for Disposable Hypodermic Products.

### Disposable Syringes and their Associated Needles

25.     Disposable Syringes consist of a plunger fitted to a plastic tube, called the barrel, and a hypodermic needle used to transfer or extract blood, medication, or other liquids to or from veins or body tissue.

26.     Disposable Syringes are available in safety and non-safety forms for use by hospitals and other healthcare providers.

27.     Becton manufactures Disposable Syringes and sells them in interstate commerce to hospitals and other healthcare providers throughout the United States, including this judicial district.

28.     A relevant product market exists for the sale of Disposable Syringes and their associated needles and the market segments thereunder.  There is no product that can reasonably be substituted for Disposable Syringes and their associated needles to fill this medical need.

29.     The relevant geographic market for Disposable Syringes and their associated needles and the market segments thereunder is the United States.

30.     Becton has monopoly and/or market power in the Disposable Syringe market and the market segments thereunder, with a market share in excess of 70%.

### Blood Collection Devices

31.     Becton manufactures Blood Collection Tubes, Blood Collection Tube Holders, and needles (all three elements of a blood collection device) and sells them in interstate commerce to hospitals and other healthcare providers throughout the United States, including this judicial district.  Blood Collection Tubes, Blood Collection Tube Holders, and their associated needles are separate products and are sold separately.

9

### A.    <u>Blood Collection Tubes</u>

32.    Blood Collection Tubes are used as part of a blood collection device which consists of a disposable needle, a blood collection tube, and a blood collection tube holder. Blood collection devices are used to extract and collect blood from patients' veins.

33.    A relevant product market exists for the sale of Blood Collection Tubes and the market segments thereunder.  There is no product that can reasonably be substituted for Blood Collection Tubes to fill this medical need.

34.    The relevant geographic market for the sale of Blood Collection Tubes and the market segments thereunder is the United States.

35.    Becton has monopoly and/or market power in the Blood Collection Tube market and the market segments thereunder, with a market share of more than 70%.

### B.    <u>Blood Collection Tube Holders</u>

36.    Blood Collection Tube Holders are used as part of a blood collection device.

37.    Blood Collection Tube Holders are available in safety and non-safety forms for use by hospitals and other healthcare providers.

38.    A relevant product market exists for the sale of Blood Collection Tube Holders and the market segments thereunder.  There is no product that can reasonably be substituted for Blood Collection Tube Holders to fill this medical need.

39.    The relevant geographic market for the sale of Blood Collection Tube Holders and the market segments thereunder is the United States.

40.    Becton has monopoly and/or market power in the Blood Collection Tube Holder market and the market segments thereunder, with a market share of more than 70%.

### IV Catheters and their Associated Needles

41.    IV Catheters consist of a disposable needle initially used to puncture the patient's skin to insert the catheter. The needle is then withdrawn leaving the catheter in place for a direct hook-up to a bottle of fluid to be delivered or to be capped for later use. The catheter is designed to deliver fluids directly into the patient's vein.

42.    Becton manufactures IV Catheters (including Winged IV Catheters), and sells them in interstate commerce to hospitals and other healthcare providers throughout the United States, including this judicial district.

43.    A relevant product market exists for the sale of IV Catheters and their associated needles and the market segments thereunder. There is no product that can reasonably be substituted for IV Catheters and their associated needles to fill this medical need.

44.    The relevant geographic market for the sale of IV Catheters and their associated needles and the market segments thereunder is the United States.

45.    Becton has market power in the market for IV Catheters and their associated needles and the market segments thereunder, with a market share of more than 50%.

### FACTUAL ALLEGATIONS

### The Monopolist: Becton

46.    Becton was founded in 1897; its first product was an all-glass syringe. By the 1950s, Becton had become the leading U.S. hypodermic syringe manufacturer. Its product line also included blood collection products and IV catheters.

47.    Since the early to mid 1980s, Becton has faced numerous threats to its monopoly and market power in the Disposable Hypodermic Product markets from rival competitors. As set out below, Becton has repeatedly been able to eliminate or impede competition from these rivals through the various anticompetitive actions alleged herein and those yet to be discovered.

Furthermore, by erecting artificial barriers to entry through the exclusionary and predatory

conduct alleged herein, Becton discouraged potential rivals from even attempting to invest the

resources necessary to challenge Becton's dominance in the markets for Disposable Hypodermic

Products.

48.    Disposable Hypodermic Products come in both safety and non-safety forms.  By

the mid 1980s, significant demand was developing for hypodermic products that would reduce

the risk of needlestick injuries to medical personnel.  Each year 600,000 to 800,000 needlestick

injuries occur in the United States exposing healthcare workers to diseases like HIV, Hepatitis B,

and Hepatitis C.  In late 2000, Congress passed the Needlestick Safety and Prevention Act

("NSPA"), which requires healthcare providers to use the safest products available.  Although

many healthcare providers continue to use standard non-safety hypodermic products, a large and

growing percentage of the market for Disposable Hypodermic Products now comprises safety

devices.

### Background: The Role of Authorized Distributors in Becton's Sale of Disposable Hypodermic Products to Class Members

49.    At all relevant times, Class members, including hospitals and other healthcare

providers, purchased Disposable Hypodermic Products from Becton through authorized

distributors who do not independently set prices for those products.

50.    Upon information and belief, Becton sells its Disposable Hypodermic Products

through a distribution process that works as follows:

  a.    A Class member negotiates a price for Disposable Hypodermic Products
        with Becton, either directly or through a GPO.

  b.    An authorized distributor takes possession of Becton's products, holds
        them in inventory until they are needed, and then delivers them to the
        Class member.

      c.     The Class member pays the authorized distributor the price the Class member negotiated with Becton. The Class member also pays the authorized distributor a delivery or administrative fee, which typically is a fixed percentage of the total sale amount.

      d.     The authorized distributor then pays Becton the amount collected from the Class Member, i.e., the amount already agreed to between Becton and the Class Member under applicable GPO agreements or otherwise directly with Becton.

      e.     As a result of this purchasing process, there is effectively only one sale: the Class Member purchases Becton Disposable Hypodermic Products at prices negotiated with Becton and then receives these Products from authorized distributors.

51.     As these authorized distributors have no independent control over pricing for Becton's products, they act solely as a distribution agent, temporarily holding inventory and then delivering the product purchased by the Class Member. The only price that the authorized distributors negotiate with Becton and/or the Class members is the price for services related to transporting and distributing purchased products. The fixed percentage the authorized distributor charges for distribution services is the same no matter the price the Class Member negotiates and then pays Becton, and the price a Class Member pays for Becton Disposable Hypodermic Products will be the same from all authorized distributors.

52.     To that end, Becton has described its authorized distributors' role in the purchase of Becton's Disposable Hypodermic Products in the following way:

> [T]he economic role of authorized distributors under the GPO contracts . . . is not that of a direct purchaser at all. Rather, these distributors basically deliver Becton's products to hospitals at prices negotiated directly between Becton and the hospital's agent (the GPO). The distributors acquire Becton's products at a pre-determined price dictated by the hospital's GPO contract, which is then covered by the hospital in full.

(Becton Request for Downstream Discovery, *Louisiana Wholesale Drug Co. v. Becton & Co.*, Civ. A. No. 05-CV-1602, D.N.J., filed Aug. 24, 2005.)

53.    Likewise, the authorized distributors report that they "buy the product directly from Becton and sell it [to] whomever Becton has a contract with, and [they] sell it at the price that Becton negotiates with that contractor. (September 27, 2005, Transcript of Discovery Motion in *Louisiana Wholesale Drug*, before The Honorable Ronald J. Hedges at p. 12.)

54.    Upon information and belief, an authorized distributor who sells Disposable Hypodermic Products to a Class member at a price below the price set by Becton risks losing the rebate from Becton.

55.    Upon information and belief, Becton also sells some portion of its Disposable Hypodermic Products to wholesalers who then resell these products to Indirect Class members.

## The GPOs' Role in this Procurement and Distribution Scheme

56.    The GPOs act as negotiating agents for tens of thousands of hospitals and other healthcare providers. It is variously estimated that between 68% and 98% of the nation's hospitals currently belong to at least one GPO.

57.    GPOs were originally conceived as a way for hospitals to save money by pooling purchasing power to negotiate lower prices for various medical products and other goods. In 1986, the GPOs convinced Congress that the manufacturers and suppliers should be allowed to pay fees to support the GPOs. Prior to 1986, any payments that a manufacturer made to a GPO would be considered an illegal "kickback" violating the Social Security Act's "anti-kickback" provisions. To allow manufacturers (rather than the hospitals) to pay the GPOs, Congress amended the Social Security Act's "anti-kickback" provisions to create an exception for amounts paid by vendors to a GPO so long as: (a) the fees were kept at 3% or lower of the purchase price; and (b) the GPO fully disclosed, in writing, to each member, all fees received from each vendor with respect to purchases made by, or on behalf of, the member.

14

58.    In addition to millions of dollars in cash payments, Becton's payment of GPO administrative fees has also taken the form of equity positions. A February 1997 article reported:

> In another twist, Premier [a large GPO] is seeking and receiving administrative fees in the form of equity positions, taking risk-sharing to another level. A recent deal with Becton & Co. calls for Premier to receive a portion of administrative fees in the form of warrants to buy Becton stock. If Becton Dickinson's fortunes rise, buoyed in part by Premier purchases, so will the value of the stock held by Premier.

As a result of arrangements like these and as part of its unlawful scheme, Becton has been able to economically influence Premier and any other GPOs that received Becton stock or warrants to favor Becton's products, regardless of price, over those of Becton's competitors.

### Becton's Use of GPO "Commitment Contracts" To Prevent Class Members From Buying Competing Disposable Hypodermic Products

59.    In furtherance of Becton's scheme to exclude competition from rival Disposable Hypodermic Product manufacturers, Becton used "commitment contracts." Commitment contracts essentially required GPO members to deal exclusively with Becton for its Hypodermic Product needs. For example, in or around 1998 Premier awarded Becton a 7.5 year sole-source contract. In or around 1999, Becton provided another GPO, Novation, a $1 million payment (in addition to the 3% administrative fees that it pays Novation) for a 4-year sole-source contract under which Becton would be the only vendor approved by Novation to sell Disposable Hypodermic Products to Novation members.

60.    These commitment or sole-source contracts were designed to prevent Class members from buying Disposable Hypodermic Products made by other manufacturers. If a Class member desired to purchase Disposable Hypodermic Products from a manufacturer that was not the chosen sole-source contractor for the GPO, the Class member risked losing numerous financial incentives.

61.    Becton's sole-source contracts with Novation, Premier, and possibly other GPOs,

worked to significantly impede and prevent competing Disposable Hypodermic Product

manufacturers from selling significant (if any) Disposable Hypodermic Products to healthcare

providers that used those GPOs.  As one of Novation's attorneys stated in a paper submitted to

the Federal Trade Commission:

> Given that GPO contracts account for seventy-two percent of hospital purchases,
> failure to win one or more GPO contracts may result in a significant loss of
> business to the losing vendor depending on the percentage of the total market for
> the product(s) represented by the purchases of a particular GPO.

Bloch, "*An Analysis of Group Purchasing Organizations' Contracting Practices Under the
Antitrust Laws: Myth and Reality*" at 15.

62.    By unlawfully excluding and impairing competition, Becton's conduct has caused

Plaintiffs and the other Class members to pay more for Disposable Hypodermic Products than

they otherwise would have paid absent Becton's illegal, exclusionary conduct.

## Becton's Use of Exclusionary Bundling Contracts

63.    Throughout the Class Period Becton used, and continues to use, predatory and

exclusionary conduct to frustrate, impair, and substantially foreclose competition from Terumo,

RTI, and other actual or potential Disposable Hypodermic Products manufacturers.

64.    A key element of Becton's conduct has been to bundle together for sale different

types of products to protect and exploit its market power.  For example, Becton has responded to

bid requests from GPOs and individual hospitals and other customers by offering "bundled"

proposals to sell its Disposable Hypodermic Products, either together or with other unrelated

products.  Becton's bundled terms include the offer of substantial financial incentives to hospitals

and other customers that agree to purchase the vast majority of their needs for the products

included in the bundle.

16

65.     Becton offers substantial financial incentives to purchasers who agree to buy all or substantially all of the products offered as part of the bundle only from Becton. Pursuant to one such purchasing program offered to MedStar, to receive the purported benefit offered under the bundle, purchasers had to agree to fill at least 95% of their Disposable Hypodermic Product needs from Becton. Under other purchasing programs, Class members who purchased less than Becton's suggested "compliance" levels of their Disposable Hypodermic Products needs from Becton were penalized by: (a) having to pay higher prices for the Disposable Hypodermic Products that it buys from Becton; (b) losing post-purchase rebates for all or most of the Becton Disposable Hypodermic Products it bought; and, in some cases (c) having to re-pay past rebates received from Becton. Furthermore, the financial incentives offered through these bundled contracts have induced GPOs to enter into sole-source supply agreements for Disposable Hypodermic Products with Becton and have caused individual hospitals and other customers to buy all or virtually all of the products included in the bundle only from Becton and to the exclusion of Becton's competitors.

66.     As an additional incentive to accept the bundle, Becton offered certain Class members "conversion" bonuses and rebates that required even further commitment to purchase multiple Becton products. For instance, under one such program, a Class member could only purchase Becton products at premium discounts if it agreed to utilize a "minimum of three of four Becton Dickinson safety product categories that include needles and syringes, IV catheters, surgical blades and blood collection." Pursuant to another conversion program, Becton offered to give Class members one free month's worth of hypodermic products as an inducement to choose Becton as their "primary" Disposable Hypodermic Product supplier.

17

67.     Many of Becton's competitors in the Disposable Hypodermic Product markets are smaller, specialized companies that sell fewer products, and in some instances, only a single product. As a result, these competitors cannot profitably match Becton's structured offers across product lines (because the combined discounts on all of the products in Becton's bundle is in many cases greater than the entire price of a single product made by another manufacturer). In certain cases, even if the competitor offered substantial discounts on Disposable Hypodermic Products (or indeed gave them away for free), it could not "replace" all the discounts and rebates that the buyer would "lose" as a penalty for rejecting Becton's bundle.

68.     As a result of the deliberately designed and structured choices Becton offered, competition from other manufacturers of Disposable Hypodermic Products was unlawfully reduced by, among other things, Becton's threat to Class members of losing financial incentives, or the exclusionary sole source contracts entered into by GPOs. Accordingly, a substantial portion of the markets for Disposable Hypodermic Products have been foreclosed. The purpose of Becton's conduct has been to permit Becton to maintain its monopoly and/or market power, otherwise restrain trade by means other than full and fair competition, and to allow Becton to continue charging supra-competitive prices to Class members.

69.     Contrary to Becton's representations that hospitals and other customers who purchased Becton's bundle would receive a financial benefit, in reality Becton's customers have actually paid more than they would have paid in the absence of Becton's unlawful conduct. The aggregated and combined market effect of the inducements described above has resulted in foreclosed competition, and correspondingly, higher prices for all purchasers. Because that market foreclosure has resulted from the collective effect of many individual purchasing

decisions, no single customer or Class Member's response to the structured purchase options made available by Becton could have caused or prevented such foreclosure.

70.    There are no significant offsetting, pro-competitive efficiencies created through Becton's use of predatory and exclusionary conduct. The rebates and pricing terms are not structured based solely upon the volume that a customer purchases, but rather upon the extent to which a hospital or other customer agrees not to purchase products from Becton's competitors.

### Becton's Use of Exclusionary Contracts
### to Restrain Trade from Competing Manufacturers

71.    Becton has used the exclusionary and predatory practices described above, including, on information and belief, bundled pricing and the offer of other similar financial incentives, to unfairly restrain and limit competition from competing manufacturers of Disposable Hypodermic Products. Beginning in the 1970s and continuing into the mid-1980s, Becton began facing competition from Terumo, a Japanese company, which manufactures certain disposable medical products, including disposable syringes and associated needles. By 1988 Terumo had gained approximately 12% of the U.S. market for various Hypodermic Products, largely by selling its hypodermic products at prices that were approximately 20% to 40% below Becton's then-current prices.

72.    In response to the growing threat to its monopoly position posed by Terumo's price reductions, Becton undertook a program called "Block Terumo" which entailed the use of an aggressive strategy that included the bundled pricing and contracting strategies described above and other similar exclusionary and predatory sales tactics. Following Becton's implementation of the "Block Terumo" strategy, Terumo's market share in the United States for the Disposable Hypodermic Products went from approximately 12% to approximately 1%. In or

19

about 1992, Terumo announced that it would no longer focus on selling hypodermic products to hospitals in the United States.

73.    Another competitive threat to Becton arose in the mid to late 1990s, following substantial growth in the demand for hypodermic products that would not pose a significant risk of needlestick injuries to medical personnel (*i.e.* safety hypodermic products). One such company was Retractable Technologies. RTI developed a syringe with a retractable needle that was specifically designed to prevent needlestick injuries. RTI's devices represented a breakthrough in safety for healthcare providers and have been recognized as superior to other disposable syringe options (including syringes made by Becton) in clinical studies and by the Emergency Care Research Institute ("ECRI"), a respected, independent research organization.

74.    Concerned about the competitive threat posed by RTI's superior products, and the growing demand among hospitals and other healthcare providers for such products, Becton was faced with the choice of competing fairly with RTI on price and quality or to use anticompetitive tactics to maintain and extend its monopoly and market power in the markets for Disposable Hypodermic Products. Becton chose the latter course, utilizing the bundled pricing and contracting strategies described above and other similar exclusionary and predatory sales tactics to foreclose competition from RTI. Becton's unlawful practices have had their desired effect of limiting competition from RTI by effectively preventing healthcare providers from in many cases even considering the purchase of RTI's products.

## DAMAGES

75.    During the relevant period, Plaintiffs and the other Class members purchased Disposable Hypodermic Products from Becton in substantial amounts. As a result of Becton's alleged illegal conduct, Class members were compelled to pay, and did pay, unlawfully inflated prices for the Disposable Hypodermic Products they purchased.

20

76.    Plaintiffs and the Class members would have been able to, *inter alia*, purchase less-expensive Disposable Hypodermic Products had competitors been able to enter the market without unlawful interference. In addition, prices would have fallen by an even greater amount had these competitors then been able to achieve economies of scale.

77.    The prices Plaintiffs and the other Class members paid for Disposable Hypodermic Products during the Class Period were substantially greater than the prices Plaintiffs and the Class members would have paid absent the illegal conduct alleged herein because: (1) the prices of all Disposable Hypodermic Products were artificially inflated by Becton's illegal conduct; and (2) Class members were deprived of the opportunity to purchase competing Disposable Hypodermic Products, other than Becton's Disposable Hypodermic Products, and to purchase those competing products at substantially lower prices. Paying these overcharges caused Class members substantial losses and damage to their business and property. The full amount, form and components of such damages will be determined after discovery and upon proof at trial.

78.    Becton's anticompetitive scheme also has had a negative effect on product innovation. The unlawful barriers Becton created have diminished competitors' motivation to develop better, safer and less expensive products. With little chance to successfully compete with Becton, there is little reason for a competitor to invest substantially in improving upon current technology. Similarly, Becton has little reason to invest in innovation due to the competition it has foreclosed. Accordingly, those who purchased Disposable Hypodermic Products, such as the hospitals and other healthcare providers that make up the Class, have been damaged by paying higher quality-adjusted prices for such products.

## CAUSES OF ACTION

### COUNT I
### Violations of Section 1 of the Sherman Act and Section 3 of the Clayton Act
### Unreasonable Restraint of Trade

79.    Plaintiffs reallege paragraphs 1-78 as set forth above.

80.    Becton has market power in the markets for Disposable Syringes, Blood
Collection Tubes, Blood Collection Tube Holders, and IV Catheters.

81.    Becton has entered into agreements with GPOs, individual hospitals and other
customers of these products where such contracts include terms providing for bundled financial
incentives, exclusive dealing commitments, and other provisions that collectively or individually
constitute unreasonable restraints of trade.

82.    These unreasonable restraints of trade have resulted in substantial harm to
competition in the United States for Disposable Syringes and Blood Collection Tube Holders,
Blood Collection Tubes and IV Catheters.

83.    There are no legitimate business justifications for Becton's exclusionary and
predatory conduct.  To the extent that there are any legitimate business reasons for Becton's
restraints of trade, they are not the least restrictive means of achieving those business purposes.
Any claimed pro-competitive business reasons for Becton's restraints of trade are outweighed by
the competitive harm that they have caused to competition in the relevant markets.

84.    As a result, Plaintiffs and members of the Class were injured in their business or
property by Defendant's restraint of trade in the relevant markets.  Plaintiffs and the other
members of the Class have been forced to pay higher prices for Disposable Hypodermic Products
in the relevant markets than they would have paid in the absence of Defendant's unlawful
conduct.

## COUNT II
### Violation of Section 2 of the Sherman Act
### Monopoly Maintenance

85.    Plaintiffs reallege paragraphs 1-84 as set forth above.

86.    Becton possesses monopoly power in the Disposable Syringe and Blood Collection Tube and Blood Collection Tube Holder markets in the United States.

87.    Becton's conduct in maintaining and extending its monopoly power in the relevant U.S. markets constitutes unlawful monopolization in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

88.    Becton has willfully and unlawfully used exclusionary and predatory conduct, including, but not limited to, bundled pricing with the intent to foreclose competition, and exclusionary agreements, to maintain and preserve its monopoly power in the markets for Disposable Syringes, Blood Collection Tubes and Blood Collection Tube Holders.

89.    Becton has engaged in the alleged conduct for the specific anticompetitive purposes of foreclosing a substantial share of the Disposable Syringe and Blood Collection Tube and Blood Collection Tube Holder markets in the U.S., and maintaining its monopoly power in the Disposable Syringe, Blood Collection Tube and Blood Collection Tube Holder markets in the U.S.

90.    Becton has not maintained its monopoly power in the Disposable Syringe, Blood Collection Tube and Blood Collection Tube Holder markets as a consequence of superior product offerings, good faith business acumen, or historical accident.  Rather, Becton has employed a pattern of predatory and economically coercive practices to force customers to make purchasing decisions in a less than fully competitive market.

91.     There are no legitimate business justifications for Becton's exclusionary and predatory conduct. To the extent that Becton has sought to achieve any legitimate business purposes through its conduct, it has not used the least restrictive means of doing so. Moreover, any claimed pro-competitive benefit is outweighed by the anticompetitive harm.

92.     As a result, Plaintiffs and other Class members were injured in their business or property by Defendant's monopolization of the relevant markets. Plaintiffs and the other members of the Class have been forced to pay higher prices for Disposable Hypodermic Products in the relevant markets than they would have paid in the absence of Defendant's unlawful conduct.

## COUNT III
## Violation of Section 2 of the Sherman Act
## Attempted Monopolization

93.     Plaintiffs reallege paragraphs 1-92 as set forth above.

94.     In the alternative, to the extent that Becton does not possess monopoly power in the Disposable Syringe, Blood Collection Tube and/or Blood Collection Tube Holder markets in the United States, it has unlawfully attempted to monopolize the markets for Disposable Syringes, Blood Collection Tubes and/or Blood Collection Tube Holders.

95.     Becton has willfully and unlawfully used exclusionary and predatory conduct, including, but not limited to, bundled pricing with the intent to foreclose competition, and exclusionary agreements, in an attempt to obtain monopoly power in the markets for Disposable Syringes, Blood Collection Tubes and/or Blood Collection Tube Holders.

96.     Becton had the specific intent to achieve its goal of obtaining monopoly power in the markets for Disposable Syringes, Blood Collection Tubes and/or Blood Collection Tube

24

Holders, and engaged in the conduct alleged above for the specific purpose of achieving those goals.

97.    There is a dangerous probability that if left unchecked, Becton will achieve its goals of obtaining monopoly power in the markets for Disposable Syringes, Blood Collection Tubes and/or Blood Collection Tube Holders.

98.    As a result of Becton's attempt to monopolize, Plaintiffs and members of the Class were injured in their business or property by Defendant's attempted monopolization of the relevant markets. Plaintiffs and other Class members have been forced to pay higher prices for Disposable Hypodermic Products in the relevant markets than they would have paid in the absence of Defendant's unlawful conduct.

## COUNT IV
## Violation of the District of Columbia's Antitrust Law, D.C. CODE ANN. §§ 28-4501 *et seq.*

99.    Plaintiffs reallege paragraphs 1-98 as set forth above.

100.    Under District of Columbia law, it is unlawful "for any person to monopolize, attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of trade or commerce, all or any part of which is within the District of Columbia." D.C. CODE ANN. § 28-4503. Additionally, "[e]very contract, combination . . . or conspiracy in restraint of trade . . . within the District of Columbia is declared to be illegal." D.C. CODE ANN. § 28-4502. At all relevant times, Plaintiffs purchased Disposable Hypodermic Products from Becton in the District of Columbia.

101.    Becton unreasonably restrained trade, willfully maintained and unlawfully exercised its monopoly and/or market power in the markets for Disposable Hypodermic Products.

102.    Becton acted willfully to maintain and exercise its monopoly and/or market power in the relevant market through exclusionary and predatory conduct set forth above.

103.    There is no legitimate business justification for the actions and conduct through which Becton unreasonably restrained trade, maintained its monopoly and/or market power or attempted to acquire monopoly power in the relevant markets.

104.    The anticompetitive effects of Becton's conduct far outweigh any conceivable pro-competitive benefits or justifications.

105.    Plaintiffs and Class members were injured in their business or property by Becton's exclusionary and predatory conduct in the relevant markets. Without limiting the generality of the foregoing, Plaintiffs and the Class members have been forced to pay higher prices for Disposable Hypodermic Products in the relevant markets than they would have paid in the absence of Becton's unlawful conduct.

## COUNT V
### Unjust Enrichment

106.    Plaintiffs reallege paragraphs 1-105 as set forth above.

107.    Becton unreasonably restrained trade, willfully maintained and unlawfully exercised its monopoly power and/or market power, or attempted to acquire monopoly power in the relevant markets Class Jurisdictions in violation of that state's antitrust laws.

108.    As a result of Becton's anticompetitive scheme alleged herein, Plaintiffs and the Class members paid too much for Becton Disposable Hypodermic Products. The payment of these "overcharges" represents an unjust benefit Plaintiffs and Class members conferred upon Becton. Becton was unjustly enriched by these illegal overcharges and equity requires disgorgement to prevent Becton from benefiting from its illegal acts.

109.    Plaintiffs and Class members were injured by Becton's conduct and seek an order directing Becton to return the benefit Becton unjustly procured, received, and retained.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, respectfully request that:

(i)    The Court determine that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23, be given to the Class;

(ii)    The acts alleged herein be adjudged and decreed to be unlawful acts in violation of Sections 1 and 2 of the Sherman Act, Sections 3 and 16 of the Clayton Act and the antitrust laws of the District of Columbia;

(iii)    The Class be granted structural, prospective relief to promote competition, and any other appropriate relief as may be determined to be just, equitable, and proper by this Court;

(iv)    Each member of the Class recover three-fold the damages determined to have been sustained by each of them, and that judgment be entered against Defendant in favor of the Class;

(v)    The Class recover its costs of suit, including reasonable attorneys' fees and costs as provided by law; and

(vi)    The Court determine that Becton has been unjustly enriched by their illegal, unfair or deceptive acts, unfair competition, and restraint of trade, and award restitution to Plaintiffs and the Class; and

(vii)    The Class be granted any other appropriate relief as may be determined to be just, equitable, and proper by this Court.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

Richard L. Wyatt, Jr. (D.C. Bar No. 424775)
Perry M. Rosen (D.C. Bar No. 374087)
Todd M. Stenerson (D.C. Bar No. 462110)
AKIN GUMP STRAUSS HAUER & FELD, LLP
1333 New Hampshire Avenue, N.W.
Washington, DC 20036-1564
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
rwyatt@akingump.com
prosen@akingump.com
tstenerson@akingump.com

AND

R. Laurence Macon
AKIN GUMP STRAUSS HAUER & FELD, LLP
300 Convent Street, Suite 1500
San Antonio, TX 78205-3732
Telephone: (210) 281-7000
Facsimile: (210) 224-2035
lmacon@akingump.com

May 18, 2006